IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 10, 2015

## STATE OF TENNESSEE v. RYAN SCOTT HARAWAY

**Appeal from the Criminal Court for Davidson County**
**Nos. 2013-D-3297, 2014-A-228, 2014-A-267, 2014-A-339, 2014-A-340, 2014-B-1272**
**Cheryl A. Blackburn, Judge**

_____

### No. M2014-02397-CCA-R3-CD – Filed September 28, 2015

_____

Pursuant to a plea agreement, the Defendant, Ryan Scott Haraway, pleaded guilty to four counts of aggravated burglary, one count of forgery, one count of theft of property, two counts of burglary of a motor vehicle, and three counts of assault. The total effective sentence was seven years with the trial court to determine the manner of service of the sentence. After a sentencing hearing, the trial court ordered the Defendant to serve his sentence in the Tennessee Department of Correction. On appeal, the Defendant asserts that the trial court erred when it denied him an alternative sentence. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Dusten E. Sharp, Nashville, Tennessee, for the appellant, Ryan Scott Haraway.

Herbert H. Slatery III, Attorney General and Reporter; Meredith Devault, Senior Counsel; Glenn R. Funk, District Attorney General; and Jeff Preston Burks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

Through multiple indictments, a Davidson County grand jury charged the Defendant with four counts of aggravated burglary, eight counts of theft of property, one count of forgery, one count of identity theft, two counts of burglary of a motor vehicle,

three counts of assault, and one count of resisting arrest. On October 3, 2014, the Defendant entered a best interest plea to four counts of aggravated burglary (committed in August and November 2013), one count of forgery (committed in August 2013), two counts of burglary of a motor vehicle (committed on November 10, 2013), three counts of assault (committed on November 10, 2013), and theft of property (committed on November 11, 2013). Pursuant to the plea agreement, the State dismissed the remaining counts, and the parties agreed to an effective seven-year sentence with the trial court determining the manner of service of the sentence following a hearing.

At the sentencing hearing, the State submitted the presentence report. A transcript of the guilty plea submission hearing is not included in the appellate record; therefore, we rely on the summary of the facts underlying these convictions provided in the presentence report. This portion of the presentence report is derived from multiple police department case summaries.

On August 5, 2013, at approximately 4:18 p.m., Officer David Willover was dispatched to [ ]Newman Place on a burglary call. Officer Willover arrived at the scene and spoke with the victim, William Harlin. The victim stated that his residence was burglarized on August 4, 2013, between 5:30 p.m., and 7:00 p.m., while he was away.

The victim inventoried his residence and discovered that a dual rifle hand carry storage bag that contained a .22 caliber rifle and .30 caliber rifle and a small television were missing.

The victim stated that entry was gained through the shattered patio door on the side of the house. The victim stated stated [sic] that on August 5, 2013, around noon, Advanced Financial called and informed him that a man was attempting to cash a check at their establishment located at 2403 Nolensville Road.

The victim was informed that the check (number 3074) in the amount of $400 was made payable to the suspect, [the Defendant] from Harlinsdale Farms Company.

The check was signed "W.W. Harlin Jr.,["] which was the victim. The victim denied Advanced Financial permission to cash the check. The victim stated that he did not know [the Defendant] or give him permission to use his check(s).

2

Further investigation revealed that a total of six checks were used by the Defendant (Haraway) and two other suspects, Edward Spencer and William Taylor, between August 4, 2013, and August 5, 2013.

. . . .

On August 7, 2013, Detective Ryan Finnegan contacted Jan Pope with Advanced Financial who forwarded surveillance photos of the incidents. The defendants were identified from the video. Warrants were obtained and served against the Defendant (Haraway) for one count each of forgery and aggravated burglary.

. . . .

The Defendant (Haraway) was apprehended and interviewed. [The Defendant] admitted that he tried to cash one of the checks, but denied writing it or breaking into any houses. Warrants were obtained and served against [co-defendant Spencer] for three counts of forgery and one count of aggravated burglary.

Warrants were obtained against [co-defendant Taylor] for two counts of forgery and one count of aggravated burglary.

. . . .

On August 12, 2013, at approximately 6:46 p.m., victim Matthew Ness called the police to report a burglary at his residence, located [on Dale Avenue]. The victim stated that his Nanny left his residence at 5:15 p.m.

The victim stated that he returned to the house at 6:40 p.m., and found the back doors opened and glass broken on one of the doors.

The door latch and wood was broken on the other door. The victim also found several items missing to include a 50″ LCD TV, a 40″ LCD TV, an [i]-Pad, miscellaneous jewelry, and various med/large pieces to a sterling serving set.

Witness William Clevenger stated that he observed a light green or beige minivan drive out of the front yard and through the side yard of the victim's residence.

3

The van then exited the yard into Mr. Clevenger's driveway and then onto the street. Mr. Clevenger described the van as being a 2007-2008 model with a slope in the back of the van and a little slope on the front. Vehicle tracks could be seen in the front of the victim's house, where they entered through his driveway and ran parallel to the house.

They then went towards the side of the house and exited towards Mr. Clevenger's driveway. Another unidentified neighbor stated that he had security video of the street.

The video was viewed, but the quality was too poor to be of assistance. The scene was processed for fingerprints and three prints were lifted. Detective Ryan Finnegan spoke with the victim and based on the M.O., vehicle description, timeframe, and area, he sent in a request for the prints to be compared to [the] Defendant [ ], William Taylor, and Edward Spencer, who were developed and charged in a similar case.

During subsequent interviews with both [the Defendant] and [co-defendant Taylor], neither suspect admitted to any involvement in the burglary. Defendant Ryan Haraway's fingerprint[s] were later matched to latent prints recovered from the back screen door, which was the point of entry into the residence. The property that was taken in this case has not been recovered.

On February 27, 2014, Detective Harrison Dooley obtained and served a warrant against the Defendant (Ryan Haraway) for aggravated burglary.

*Note: The Defendant was charged with another burglary that occurred close to the same time as this burglary and in the same area. While out on bond for the other burglary, the Defendant committed several more burglaries and used the same silver van as in this burglary.

　　. . . .

On November 7, 2013, at approximately 2:35 a.m., victim Steven Liddle called police to report a burglary in progress, [on] Tyne Valley Boulevard.

The victim stated he was home when he heard a noise, around 2:30 a.m., and went to investigate. The victim stated he noticed the back door open and a window broken. He also noticed that the TV, Playstation 3, and his

fiance's purse were also missing.  The TV was later recovered from the back porch stairs.

. . . .

On November 11, 2013, Detective Ryan Finnegan spoke with the victim who stated that his neighborhood had video cameras, at the entrance and exit to the subdivision.  The victim stated that he viewed the video and it looked like a Dodge or Chrysler minivan that entered the subdivision, at 2:16 a.m, and it left at 2:36 a.m.

The victim also stated that the gift cards that were taken were found by a citizen . . . it appeared they were discarded by the suspect.

Based on the vehicle description, location of the home, method of entry, items taken, and the location of where the gift cards were found, Detective Finnegan believed [the Defendant] to be the viable suspect.

On November 25, 2013, Detective Finnegan reviewed the video footage. Camera #1 showed that at 2:16 a.m. and 50 seconds, a van, matching one [the Defendant] was arrested in, was observed pulling into the victim's half circle drive.

The lights were turned off, on the vehicle, and it stayed parked.  At 2:20 a.m. and 17 seconds, there was a figure, medium-large in stature, walking from the van and up to the house.  At 2:20 a.m., what appeared to be the same figure ran from the house to the driver's side of the van.  The van then pulled out of the drive and then out of the neighborhood, at 2:36 a.m.

Although the tag was not visible through the night vision camera, it did show what appeared to be a male white driving the vehicle.

The vehicle was also identical make and model, had identical wheels and identical rear bumper damage, as the van that the Defendant [ ] was arrested in.  The Defendant [ ] was also arrested in the same vehicle, on August 13, 2013, in relation to another aggravated burglary.  A search warrant was also executed on the Defendant['s] [ ] vehicle . . . after his arrest, in which stolen items from other burglaries in the same area were found.

. . . .

5

Between November 8, 2013, at 4 p.m. and November 12, 2013, at 5:30 p.m., [v]ictim Daniel Harris was gone from his residence, [on] Sweetbriar Avenue. When the victim returned, on November 12, 2013, he found his residence had been broken into. Stolen from the residence were a 60[″] television (with a Direct TV remote, Samsung remote), a Blu-ray player, older Macbook, three bottles of bourbon, and a white laundry basket.

On the morning of November 10, 2013, Defendant Ryan Haraway was arrested for breaking into a vehicle near the location of this victim's burglary. At that time, the vehicle he was using was also held by police.

A few days later a search warrant was executed on the Defendant's vehicle[.] . . . Inside the vehicle, there was a laundry basket, with a Direct TV and Samsung remote inside of it. The remotes that were stolen from this burglary matched the ones that were located in the back of the Defendant's vehicle.

. . . .

During the search . . . of the Defendant's vehicle, there were also liquor bottles that were stolen from the other burglaries that the Defendant was suspected of [ ]. The Direct TV remote was also programmed to only turn on the victim's Direct TV box.

The remote turned the box on when Detective Michael Brickman tried it. The victim also identified the laundry basket as his through a picture, because it still had the sticker and distinct redmarks on it that the victim also recognized. The TV, Blu-ray player, bourbon, or Macbook were never recovered.

On November 9, 2013, at approximately 6:34 p.m., victim Molly Hood reported a burglary at her residence, [on] Graybar Lane.

Entry was made through the back door, of the residence, where the door had been pried open with a blunt object. Stolen from the residence were an aqua 32″ television and a brown bag with assorted work/personal documents. The victim's brown bag was discovered by a passerby, [on Ashwood], lying in the street.

. . . .

6

This burglary was similar to burglaries that Defendant Ryan Haraway had committed in the recent past. Detectives knew that the Defendant was out on bond for previous burglary and theft offenses. The Defendant was arrested when he was caught, by West Officers, breaking into vehicles, on November 10, 2013.

The Defendant was arrested in the same vehicle that he was in the last time he was arrested. During previous arrest, in an interview, the Defendant told Detective Ryan Finnegan that he would live in his vehicle while he binged on crack cocaine.

Due to [the] Defendant's previous statements, there was a strong possibility that there was property from this burglary in his vehicle. On November 11, 2013, detectives executed a search warrant on the Defendant's vehicle and found property that was taken during this burglary.

The property consisted of various journals and documents bearing the victim's name, as well as pictures of the victim. The victim was able to identify the property as hers that was taken in the burglary. The property was released to victim, at that time.

    . . . .

On November 9, 2013, at approximately 7:34 p.m., victim Bradley Gavigan reported a burglary at his residence, [on] Linden Avenue. Entry was made into the residence through the front door, where it was kicked in. Police responded to the scene and cleared the residence. After the residence was cleared, the victim inventoried the home for property that had been taken.

Stolen were three bottles of liquor, along with a Sony television and a Sony DVD player from the master bedroom upstairs. The television in the downstairs living room was not taken, however; the suspect attempted to take it, but was unsuccessful in detaching it from the wall mount.

    . . . .

Detectives knew the Defendant was out on bond for previous burglary and theft offenses. . . .

    . . . .

7

Due to the Defendant's previous statements, there was a strong possibility that there was property from this burglary in his vehicle. . . .

[From the Defendant's vehicle] police recovered an empty bottle of Chopin vodka, which the victim stated was sitting out on the bar. The Defendant had also taken alcohol in several burglaries, but this was the only bottle in the vehicle.

This type of vodka is rare and distinct.

        . . . .

On November 10, 2013, at approximately 0318 hours, officers were dispatched to [ ] 16th Avenue South on a theft call. While the officers were searching the area Officer A. Venable heard glass break and observed a male white subject in the parking lot next to a blue Pontiac located [on] Villa Place.

The suspect, identified as [the Defendant], refused to answer any questions. Officers M. Lynch and T. Lowen were assisting Officer Venable as he was attempting to place [the Defendant] under arrest. [The Defendant] refused to get on the ground. He would not give the officers his hands.

He pushed and grabbed Officer Lynch's clothes. During the struggle Officer Lynch sustained cuts and scrapes on his arms and legs. He also received a cut on his lip. Also during the apprehension, the Defendant kicked Officers Venable and Lynch. Officer T. Loewe was also bitten.

During the investigation, the officers determined that two vehicles had been broken into. A blue Pontiac belonging to John Kiefer, [who resided on Villa Place] and a white Toyota 4-Runner that belonged to Joseph Dill [who also resided on Villa Place].

The passenger window was busted out of Joseph Dill's vehicle. Officer R. Buckman made attempts to contact the victims but he was unsuccessful. Therefore, besides the damage to the vehicles, the officers were unable to determine if there were any items missing at the time of this report.

At the sentencing hearing, Kayla Haraway, the Defendant's daughter, testified that her parents divorced when she was five-years old and thereafter shared joint custody. She stated that following the divorce, she spent time with her father on a "regular basis."

8

Kayla Haraway described her father as an "amazing man," "supportive," and "loving." She also acknowledged times where her father would "just disappear." At around the age of seven or eight, Kayla Haraway began wondering, due to her father's disappearances, if he had an addiction issue.

Kayla Haraway testified that she had visited the Defendant in jail once or twice a month since his arrest for these offenses. She said that the Defendant had acknowledged that his actions were "wrong" and that his family wanted the Defendant to come "home." Kayla Haraway confirmed that the Defendant had disclosed to her his need for treatment of his drug addiction. Kayla Haraway stated that the Defendant was a "changed man" and expressed her desire to have the Defendant in her "life for good."

Tricia Haraway, the Defendant's mother, testified that she had visited the Defendant in jail regularly since his arrest for these offenses. She said that the Defendant had expressed regret and remorse for his actions related to these crimes. The Defendant had also admitted his addiction to cocaine and alcohol. Tricia Haraway stated that, if released, the Defendant could reside with her. She stated that she had arranged for the Defendant's enrollment in an outpatient drug treatment program and that she was committed to providing him with transportation to the program and any other appointments the trial court required.

The Defendant testified that, due to an accident during his senior year in high school, he withdrew two months before graduation and obtained his GED. He stated that he worked "remodeling" but had been taking online classes through Ashworth College during his incarceration. The Defendant stated that he had four children and two stepchildren.

The Defendant testified that he was not blaming his actions solely on his drug abuse but acknowledged that his addiction played a role in his committing these offenses. He explained that when he first realized that he was drinking too heavily he attended a "Christian outreach ministry and got saved and would have long periods of sobriety." He also acknowledged that he had a "relapse problem." Before the Defendant committed these offenses, he had relapsed using crack cocaine. During his subsequent incarceration he had enrolled in classes and worked as a trustee. He said that he read a great deal while in jail.

The Defendant testified that, if granted an alternative sentence, he would be admitted to an outpatient drug program, Court Foundations Center, which required meetings four times a week and weekly drug tests. The Defendant expressed his desire to "stay sober." He then acknowledged his role in the crimes and expressed an apology to

9

the victims of the crimes and his family. The Defendant then read the following statement:

> My miscreant behavior has caused me to make numerous bad decisions throughout the course of my life. While I've had past misdemeanor charges this is the first time I've ever faced felony charges and spent this much time incarcerated. I'm truly sorry for my actions, and I apologize to everyone involved, including my own family. This past year that I've been incarcerated has taught me what a foolish and selfish individual I've been. I've had a lot of time to reflect upon my life, and I am ashamed of my poor decisions. I pray that the Court will allow me a second chance. I will no longer live a miscreant lifestyle or engage in any criminal behavior. I want the Court to rest assured that a decision for probation would not be a grave miscarriage of justice. I will be the poster child at the Court's mercy. Your Honor, I'm not perfect, but I promise you this past year of incarceration has opened my eyes. I believe I have a lot to offer our community, and I humbly and respectfully pray for this Court to grant me probation. And, again, I sincerely apologize to everyone, and I think you for allowing me to address this court.

On cross-examination, the Defendant agreed that in Davidson County he had been convicted of driving under the influence, simple possession, possession of drug paraphernalia, theft, and criminal trespass dating back to 2005. The Defendant agreed that, in 2008, he violated a probation sentence for simple possession in Rutherford County and was ordered to serve forty-five days. When asked about the specifics of his responsibility and role in the burglaries, the Defendant stated "I can't recall exactly," explaining that he was "on a drug binge."

The Defendant testified that he had enrolled in multiple drug treatment programs in the past. He recalled that he attended Cumberland Heights in 2011 and an outreach ministry in Cincinnati. He also was admitted to Buffalo Valley in 2006 for a twenty-eight day program. The Defendant agreed that he was released on bail in August after being arrested for forgery and aggravated burglary. He was thereafter arrested on November 10, 2013, when a police officer observed the Defendant breaking into a car. The Defendant was charged with resisting arrest and assaulting the officer after the police officer approached him about breaking into the car. About this incident, the Defendant explained that he was "jumped on by the police officers" and that he "asked them to talk to [him]." He stated that he was intoxicated and resisted but "should have done what they told me to do."

10

On redirect examination, the Defendant testified that even though he entered a best interest plea he was taking responsibility for these crimes. Upon questioning by the trial court, the Defendant acknowledged the seriousness of a burglary during the middle of the night while the residents were in the home and could not provide an explanation for his behavior. The Defendant agreed that he was out of jail on bond "during the course of this spree." He further agreed that his prior attempts at rehabilitation had not prevented him from relapse and committing additional offenses. He maintained, however, that he had learned a great deal during the past year of incarceration.

Alarick Pruitt, a Davidson County Drug Court case developer, testified that his assessment of the Defendant resulted in the conclusion that the Defendant would not be a good candidate for the program. He explained that the Defendant suffered from a back injury and took narcotic medication to treat the pain. The Sheriff's Department reported that the Defendant had refused treatment on at least thirty-five occasions. The Defendant was offered Aleve, a non-narcotic medication, which he declined. As of October 12, 2014, the Defendant reported to medical staff that he could "barely walk." The Defendant's medical records indicated that he had made over fifty medical complaints over a ten-month period, and Mr. Pruitt stated that the Drug Court program "just [did] not have the resources or staff" to address the need for "full-time medical attention" that it appeared the Defendant required.

The Defendant's attorney provided a letter from a therapist who indicated he would help "facilitate" the Defendant admission into a treatment facility, the Hope Center.

After hearing this evidence, the trial court considered the purposes of sentencing, the evidence presented at the sentencing hearing, the presentence report, the principles of sentencing and the arguments as to alternative sentencing. The trial court first concluded that the Defendant was eligible for an alternative sentence. It then considered that the Defendant had six prior misdemeanor convictions and a probation violation. The trial court noted that the Defendant had committed some of the offenses while he was released on bond for the other offenses. In mitigation, the trial court acknowledged that the Defendant had pleaded guilty and that the Defendant did not have a long history of prior criminal conduct. In reviewing the Defendant's criminal record the trial court noted that the Defendant had been afforded probation sentences before and yet continued to commit offenses. The trial court recognized that the specific circumstances of the offenses, entering homes while the occupants were asleep in the residence and committing offenses while released from jail on bond, were significant factors in consideration of an alternative sentence. The trial court concluded that an alternative sentence was not appropriate in this case and ordered the Defendant to serve the remainder of his sentence

in the Department of Correction. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court abused its discretion when it denied an alternative sentence because he is "especially suited for alternative sentence." He contends that because the evidence indicated that he has "a strong and willing support network" and a "lifelong struggle with addiction" that "is best treated in the community where professional intervention is found," he is "an ideal candidate" for alternative sentencing. The State responds that the trial court properly denied the Defendant alternative sentencing. We agree with the State.

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) (2014) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. T.C.A. § 40-35-303(a) (2014). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he or she is a suitable candidate for probation. T.C.A. § 40-3-303(b); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Bingham*, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. *Bingham*, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis considering "the nature of the offense and the totality of the circumstances . . . including a defendant's background." *State v.* Ashby, 823 S.W.2d 166, 168 (Tenn. 1991) (quoting *State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986)). In

determining if incarceration is appropriate in a given case, a trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1) (2014). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103.

The record supports the trial court's findings in this case. Over the course of a four-month period, the Defendant repeatedly entered homes and stole items from the occupants. At least one of the break-ins occurred while the residents were in the home asleep. The Defendant was arrested in August for his role in a burglary, released on bond, and continued committing criminal offenses until apprehended by the police in November during his attempt to burglarize a motor vehicle. The Defendant testified at the sentencing hearing about his drug abuse and past failed attempts at rehabilitation. While the Defendant's criminal history was not extensive, the record shows that the Defendant had violated the terms of a prior probation sentence.

The trial court considered the pertinent facts of this case and appropriate sentencing principles. The trial court denied alternative sentencing based on the circumstances of the offense, the Defendant's past failed attempts at less restrictive measures, and to avoid depreciating the seriousness of these crimes. The Defendant has not established that the trial court abused its discretion by denying his request for an alternative sentence. The Defendant is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the trial court properly sentenced the Defendant. As such, we affirm the trial court's judgments.

_____

ROBERT W. WEDEMEYER, JUDGE